UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

UNITED STATES OF AMERICA,                    Case No. 6:10-cr-60105-AA

       Plaintiff,                              OPINION AND ORDER

   v.

BRIAN SCOTT HARPER,

       Defendant.

_____

AIKEN, Chief Judge:

   Defendant is charged with felon in possession of a firearm under the Armed Career Criminal Act. 18 U.S.C. §§ 922(g)(1), 924(e). Defendant now moves to suppress the out of court identification of him by four law enforcement officers, arguing that the identification procedures were unduly suggestive and inherently unreliable.

   On April 16, 2014, the court heard oral argument and testimony from seven witnesses. The motion is granted, in part.

1  - OPINION AND ORDER

## I.  BACKGROUND

On July 24, 2010 at approximately 12:35 a.m., Benton County Sheriff Deputies Aaron Gevatosky and Brian Lundy were in a patrol car traveling west on Highway 20 near Philomath, Oregon, when they noticed an oncoming motorcycle. As the motorcycle passed by the patrol car, Gevatosky looked in his rear view mirror and saw that the motorcycle did not have an operating tail light. Driving a motorcycle without a tail light is a traffic violation. See Or. Rev. Stat. § 816.320(1)(b).

As Gevatosky slowed, both deputies could hear the motorcycle accelerating. Gevatosky turned the patrol car around and activated the emergency overhead lights, siren, and video recording device. Gevatosky and Lundy soon caught up with the motorcyclist and estimated the motorcycle's speed at 110 miles per hour. Despite the activation of the overhead lights and siren, the motorcyclist did not stop.

The motorcyclist was headed eastbound toward Philomath. The patrol supervisor, Deputy James Hardison, advised Gevatosky that if the motorcycle entered Philomath at those speeds, he was to "shut down" the pursuit. Gov't Ex. 7, Ex. 8 (audio recording).

Philomath Police Officers Matt Moser and James Thurman were parked in separate patrol cars on Highway 20 at Garrett Lane. As the motorcyclist approached that location, Gevatosky and Lundy

saw him throw a large white cloth containing a black item toward the center of the roadway.

Thurman heard Gevatosky announce over the police radio that the motorcyclist had thrown something from the motorcycle, possibly a gun. Moser joined the pursuit of the motorcycle, while Thurman looked and found a 12-gauge, sawed-off, single-barreled shotgun lying on Highway 20. After learning about the gun, Hardison told Gevatosky to continue the pursuit but to use his best judgment as to speed and traffic. Gov't Ex. 8 (audio recording at 6:43-7:00).

Benton County Sheriff Deputy Christopher Duffitt and Reserve Deputy Brian Horn were in a patrol car parked on the north side of Highway 20, facing westbound near milepost 47. Duffitt directed the patrol car's headlights at the approaching motorcyclist and pointed his patrol car's spotlight at the motorcyclist as he passed. The motorcycle drove by Duffitt and Horn at approximately eighty miles per hour. Transcript of Proceedings (Tr.) at 22, 56 (April 16, 2014). Duffitt and Horn estimated that they viewed the motorcyclist for two to five seconds. Tr. 58-59, 61, 84. Duffitt and Horn then joined the pursuit.

Hardison's patrol car was parked at the intersection of Main and 21st Streets in Philomath, with Brent Iverson's patrol

3 - OPINION AND ORDER

car parked behind him. The patrol cars' headlights were on and pointed perpendicular to Highway 20.

As the motorcyclist passed by Hardison and Iverson, he reportedly slowed to approximately fifty miles per hour and waved at the deputies. Tr. 23, 25, 109-10. Hardison reportedly saw the motorcyclist's face for approximately five seconds. Tr. 114. On an audio recording at about this time, Hardison is heard describing the motorcyclist as a "heavy set male, probably forty-five years old, thick handlebar mustache, dark hair." Gov't Ex. 8 (audio recording at approximately 9:34); tr. 110.[1]

Hardison and Iverson joined the pursuit of the motorcyclist as he continued eastbound through Philomath and towards Corvallis, Oregon.

Corvallis Police Officer Jason Harvey had parked his patrol car on Highway 20 near Clemens Mill Road facing westbound. Officer Harvey heard the oncoming motorcycle, turned on his patrol car's headlights, and directed his spotlight toward the motorcyclist as he passed. The motorcycle was traveling at

---

[1] The person speaking on the audio recording identifies himself as "445" prior to giving the description of the motorcyclist. Gov't Ex. 8 (audio recording at 9:32); see also Gov't Ex. 7. The government indicated in its brief that Duffitt provided this description; however, Duffitt testified that he did not recall giving a description to dispatch, tr. 75-76, and several exhibits identify "445" as Hardison. Gov't Ex. 5 at 2, Ex. 13. Therefore, I find that it was Hardison who provided the description to dispatch.

approximately seventy miles per hour, and Harvey reportedly saw the motorcyclist's face. Tr. 134; Gov't Ex. 14.

The motorcyclist entered Corvallis and drove through a red light as he proceeded downtown. After watching the motorcyclist speed through a series of red lights at eighty to ninety miles per hour, Gevatosky terminated the pursuit. However, law enforcement officers continued to look for the motorcyclist.

Approximately two hours later, Moser returned to the Philomath Police Station, where Thurman had taken the shotgun. Moser saw carvings on the shotgun and contacted Hardison by telephone. Tr. 49-50, 93, 118. Moser informed the deputy that the word "Bear" was carved into the stock of the shotgun. Tr. 50, 120. Hardison recalled a 2007 encounter with a man called "Bear," defendant Brian Harper, whose physical appearance was similar to that of the motorcyclist.[2] Tr. 117, 119-20.

---

[2] On January 28, 2007, Hardison stopped a pickup truck driven by a driver with a suspended license, Kirk Gordon. Defendant was a passenger in the vehicle. Gordon told Hardison that his passenger went by the name "Bear." "Bear" did not have any identification with him and claimed he was "Grady Scott Clinton" from Arizona. Hardison told "Bear" that he was receiving a citation for not wearing a seat belt and would be arrested if he had given the deputy a false name. When the sheriff's dispatcher could not locate a "Grady Scott Clinton," Hardison arrested "Bear" for providing false information.

After "Bear" was lodged into jail, his fingerprints were taken and matched those of defendant. Hardison learned that defendant had been convicted for delivery of an illegal drug and had an outstanding felony warrant for his arrest. The deputy

Hardison asked the dispatcher for information about defendant. Hardison learned that defendant had numerous felony warrants for his arrest and was identified as a potential armed career criminal. Gov't Ex. 13. At Hardison's request, the dispatcher sent him a Department of Motor Vehicles (DMV) photograph of defendant. Tr. 118-19. The photograph depicted defendant with a handlebar-type moustache and described his height as approximately six feet and his weight as 266 pounds.[3] Gov't Ex. 17. After reviewing the photograph, Hardison suspected that defendant was the motorcyclist. Tr. 119. Hardison then shared his observations with those involved in the pursuit, tr. 125, and he "put [defendant's] name over the radio as a possible

---

also learned that defendant had been identified as a potential armed career criminal.

Hardison arrested defendant on the outstanding warrant and attached a booking photograph of defendant to his report. During this incident, Hardison spent more than two and half hours with defendant. See Gov't Exs. 1, 2.

[3] Counsel for defendant disputes that the moustache depicted in defendant's DMV photograph is accurately described as a "handlebar moustache," as it grew along the top of defendant's lips and slightly down the sides. Counsel submitted an exhibit reflecting what he believed to be a true handlebar moustache, with the ends styled to curl or "twirl" upward. See Def.'s Ex. Hardison-6; tr. 60. Notwithstanding the photograph of Rollie Fingers, all of the officers testified that they considered the moustache in defendant's DMV photograph to be a "handlebar" moustache. Tr. 60, 74, 83, 97.

suspect because [he] wanted everyone to know who [they] were dealing with." Tr. 120.

In the meantime, Gevatosky retrieved the shotgun from the Philomath Police Department and transported it to the Benton County Sheriff's office for examination. Gevatosky noticed that the stock had the words "Bear" and "12g3 Fuck-um" inscribed where the serial numbers should have been. Tr. 29-30. Gevatosky also provided this information to Hardison. Tr. 30.

Over the police radio, Harvey heard Hardison request information about defendant as a possible suspect. Tr. 130, 137. Harvey then used the mobile computer in his patrol car to retrieve defendant's DMV photograph. Tr. 130. Harvey believed there was a "strong likelihood" defendant was the motorcyclist. Tr. 138; Gov't Ex. 14.

Duffitt and Horn returned to the Sheriff's office a few hours after the pursuit ended. Tr. 66. Hardison had shared his identification of defendant with Gevatosky, who told Duffitt that Hardison had identified defendant as "a possible suspect" and that the shotgun had "Bear" engraved on it. Tr. 67-68. Duffitt also learned that Hardison had a previous encounter with defendant, "aka Bear." Tr. 68. Duffitt viewed defendant's DMV photograph and asked Horn to look at the photograph as well. Tr.

69-70, 85; Gov't Ex. 17. Both deputies reportedly identified defendant as the motorcyclist. Tr. 69, 86.

In a subsequent police report, Hardison described the motorcyclist as a heavy-set white male, about forty-five years old, at least 240 pounds, over six feet tall, with dark hair and a handlebar-type mustache and wearing a small open face helmet. Gov't Ex. 13. On July 28, 2010, Duffitt reported that he observed a heavyset male with a handlebar mustache, forty to fifty years old, wearing dark glasses or goggles and black clothing, and riding a Harley Davidson motorcycle with raised handle bars. Tr. 71; Gov't Ex. 11. On July 29, 2010, Horn similarly described the motorcyclist as forty to fifty years old, with a handlebar mustache, black clothing, and driving a Harley Davidson motorcycle with raised handle bars. Tr. 82; Gov't Ex. 12. In a report dated August 19, 2010, Harvey described the motorcyclist as a large male with a round face and slight facial hair. Gov't Ex. 14.

After an indictment was returned, an arrest warrant was issued for defendant. He was arrested in Las Vegas, Nevada in September, 2013.

## II.  DISCUSSION

Defendant moves to suppress the admission of the out of court identifications made by the four law enforcement officers,

arguing that their viewing of a single photograph was an impermissibly suggestive identification procedure and inherently unreliable given the circumstances. The government responds that the identification of defendant was similar to a "show up" procedure,[4] and that it was neither suggestive nor unreliable.

The Due Process Clause protects against suggestive photographic identification procedures that create a substantial likelihood of misidentification. Neil v. Biggers, 409 U.S. 188, 198 (1972); Simmons v. United States, 390 U.S. 377, 384 (1968). To determine whether a photographic identification is constitutionally permissible, the court must consider the totality of the circumstances. Neil, 409 U.S. at 199.

If a challenged procedure is not impermissibly suggestive, the inquiry ends and suppression is not warranted. See United States v. Bagley, 772 F.2d 482, 492 (9th Cir. 1985). If a pretrial identification procedure is found impermissibly suggestive, exclusion of the identification is not necessarily required. See Manson v. Brathwaite, 432 U.S. 98, 113-14 (1977); Neil, 409 U.S. at 198-99; see also Perry v. New Hampshire, 132 S. Ct. 716, 724 (2012) ("Even when the police use [a suggestive] procedure . . . suppression of the resulting identification is not the inevitable consequence.") (citation omitted). Rather,

---

[4] A "showup" is a procedure where only one suspect is shown to a witness for identification purposes.

the court must analyze whether the identification is reliable in light of several factors.

Factors the court must consider include: 1) the opportunity of the witness to view the suspect; 2) the witness' degree of attention; 3) the accuracy of the witness' prior description of the suspect; 4) the witness' certainty regarding the identification; and 5) the length of time between the alleged crime and the identification. Manson, 432 U.S. at 114; Neil, 409 U.S. at 199-200. "Where the indicators of [a witness'] ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion, the identification should be suppressed." Perry, 132 S. Ct. at 725 (internal quotation marks and citation omitted). "Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury." Id.

Here, I find it debatable whether Hardison's view of defendant's photograph was unduly suggestive. Notably, Hardison's belief that defendant was a suspect did not arise from his observation or recognition of the motorcyclist; rather, he initially suspected defendant because defendant's nickname, "Bear," was carved on the firearm. Tr. 117, 119. After Hardison recalled that defendant's large stature resembled the motorcyclist's, he looked at only one photograph of defendant

before identifying him as the motorcyclist. Tr. 119. Generally, absent extenuating circumstances, the exhibition of a single photograph is considered unnecessarily suggestive. United States v. Montgomery, 150 F.3d 983, 992-93 (9th Cir. 1998). Hardison's identification is somewhat problematic, as the emphasis on a single individual increases the danger of misidentification.

However, even if Hardison's view of the photograph was suggestive, I find that factors bearing on reliability weigh in favor of admitting his identification. Hardison had extended contact with defendant three years before the motorcycle pursuit and was familiar with defendant's appearance. Gov't Ex. 2. While Hardison viewed the suspect for only a few seconds, the motorcyclist had slowed to approximately fifty miles per hour when passing Hardison, providing a somewhat better opportunity to ascertain his descriptive features. Tr. 23, 109-10. In fact, Hardison provided a contemporaneous description of the motorcyclist shortly after he drove by Hardison's location. Gov't Ex. 8 (audio recording at 9:34).

Under the circumstances, Hardison would have paid close attention to the motorcyclist; his contemporaneous description, though not detailed, generally described defendant's appearance at the time. Hardison was certain that the motorcyclist was defendant, based on his observations and prior contact with

defendant, and Hardison made his identification a few hours after the motorcycle pursuit. In sum, I find that these factors outweigh the suggestiveness of the photographic procedure; the ultimate reliability of Hardison's identification is best left to the trier of fact.

The same cannot be said of the identifications by Duffitt, Horn, and Harvey. Not only were their identification procedures unnecessarily suggestive, the reliability factors cannot overcome the "corrupting effect of the suggestive identification itself." Manson, 432 U.S. at 114.

Like Hardison, each of these officers viewed only one photograph of defendant before identifying him as the motorcyclist. Unlike Hardison, however, none of the officers had prior contact with defendant and had no idea what he looked like before viewing his DMV photograph. Thus, their review of defendant's photograph was not triggered by their own memories or recollection of his appearance.

Instead, the officers viewed defendant's photograph after Hardison announced that he suspected defendant, aka "Bear," was the motorcyclist. Tr. 67-70, 88, 122-24, 137, 140. It is undisputed that Hardison "put [defendant's] name over the radio as a possible suspect" and shared his observations with "most of the guys that were involved" with the pursuit. Tr. 120, 125. Cf.

United States v. Lewin, 900 F.2d 145, 149 (8th Cir. 1990) ("Telling the undercover officers that the photo spread contained the photographs of individuals who had been arrested at the apartments was impermissibly suggestive.").

In other words, defendant was already considered a suspect and associated with the name "Bear" in the minds of the officers before they even looked at his DMV photograph. Duffitt also knew of Hardison's prior contact with defendant, tr. 67-68, and he testified that Hardison's identification of defendant played a role in his own identification. Tr. 70. These circumstances render the identification procedures suggestive.

Further, Duffitt asked Horn to view defendant's DMV photograph, and they discussed the identification of defendant amongst themselves and with others at the Sheriff's Office. Tr. 69, 72, 85; tr. 31 (testimony that officers "passed around" defendant's photograph at the Sheriff's Office); Gov't Ex. 5 at 6; see also Bagley, 772 F.2d at 494 ("Clearly, the better procedure is to keep witnesses apart when they view photographic spreads."); United States v. Kessler, 692 F.2d 584, 586 (9th Cir. 1982) (permitting identification where there was "no indication in the record that the officers encouraged or permitted group consultation"). Unlike Manson, where an officer left a photograph of a potential suspect in a colleague's office

13 - OPINION AND ORDER

to view "at his leisure," 432 U.S. at 116, the officers' group discussion about the motorcyclist's suspected identity arguably created "pressure to make an identification arising from the presence [or suggestion] of another." Id. (bracketed words added).

By finding the photographic procedures suggestive, I do not imply that the officers' conduct was improper or intentionally suggestive. To the contrary, I find that the officers merely were attempting to discern the identity of the motorcyclist to further their investigation and to be "on the lookout," so to speak, for an individual who fit the description of the motorcyclist. Certainly, it is not improper for officers to discuss the appearance or identification of a criminal suspect or to rely on a colleague's description of a suspect when investigating a crime. Nonetheless, "what triggers due process concerns is police use of an unnecessarily suggestive identification procedure, *whether or not they intended the arranged procedure to be suggestive*." Perry, 132 S. Ct. at 721 n.1 (emphasis added). Therefore, even though I do not find intentional misconduct on the part of the officers, viewing only one photograph of defendant - after a supervising deputy identified him as the suspect - was unnecessarily suggestive under the circumstances.

14  - OPINION AND ORDER

Further, the indicators of reliability do not outweigh the suggestiveness of the photographic procedures so as to render these identifications admissible.

First, the officers had a limited opportunity to view the motorcyclist, lasting a few seconds at most. Tr. 58, 84, 114. The motorcyclist passed by Duffitt, Horn, and Harvey at very high rates of speed – seventy to eighty miles per hour - in the dark of night, wearing a half-helmet and dark clothing. See United States v. Drake, 543 F.3d 1080, 1089 (9th Cir. 2008) (a show-up procedure was not impermissibly suggestive where "the district court found that Ms. Guzman had ample opportunity to view the robber as they were standing face to face in close proximity to each other"). Based on my review of the patrol car videos, it is difficult to find that these officers had a sufficient opportunity to discern the facial features of the motorcyclist. Gov't Ex. 8 (video recordings). Unlike Hardison, none of the officers provided a contemporaneous description of the motorcyclist as he drove by their locations.

Second, while it is likely that all of the officers paid close attention to the motorcyclist, they viewed the motorcyclist for only a few seconds as he sped by them. Further, they provided no description over the police radio.

15  - OPINION AND ORDER

Third, while the officers' descriptions of the motorcyclist were similar and resembled defendant's appearance, I give this factor limited weight. It is difficult to compare the officers' identifications of defendant with their "prior" descriptions of the motorcyclist, Manson, 432 U.S. at 114, because no officer provided a description before viewing defendant's photograph. See Gov't Brief at 18 ("The deputies and officers wrote their descriptions of the motorcyclist in their reports *after* they had viewed the Defendant's driver's license photograph and identified him as the eluding motorcyclist.").

Instead, Duffitt described the motorcyclist in a report written four days after the pursuit. Tr. 71. Horn similarly wrote his report five days later, and neither his nor Gevatosky's report mention Horn's identification of defendant. Tr. 82, 87; Gov't Ex. 5 at 6, Ex. 12. Harvey wrote his report on August 19, 2010, several weeks after the pursuit, and after he had learned of Hardison's prior contact with defendant. Tr. 136, 140. In other words, Duffitt, Horn, and Harvey did not describe the motorcyclist until they had heard Hardison's description, knew Hardison had identified defendant as a suspect, and had, themselves, identified defendant as the motorcyclist from his DMV photograph. Therefore, this factor does not weigh in favor of admission.

Fourth, as to certainty, Duffitt and Horn were certain that defendant was the motorcyclist, and Harvey believed it was a "strong likelihood." Gov't Exs. 11, 14; Tr. 86. Again, I give this factor limited weight given the circumstances in which the officers viewed the motorcyclist. They had a quick glimpse of the motorcyclist during a high-speed chase, and they knew defendant was a suspect when they identified him. These facts dilute the certainty of the officers' identification.

As to the fifth and final factor, the officers identified defendant from his DMV photograph within a few hours of the motorcycle pursuit. However, based on the totality of the circumstances described above, this factor does not tip the balance in favor of admission.

In sum, weighing these reliability factors against the "corrupting effect of the suggestive identification itself," Manson, 432 U.S. at 114, I find a "very substantial likelihood of irreparable misidentification." Simmons, 390 U.S. at 384. In particular, I note the cumulative effect that the officers' identifications would have if admitted along with Hardison's identification of defendant. Each officer's identification would lend weight to another's, resulting in irreparable prejudice to defendant when these identifications stemmed from an unnecessarily suggestive photographic identification procedure.

17 - OPINION AND ORDER

CONCLUSION

While sufficient indicia of reliability permit Hardison's identification of defendant, the taint of suggestion precludes admission of Duffitt's, Horn's and Harvey's identifications of defendant. Accordingly, defendant's Motion to Suppress (doc. 15) is GRANTED with respect to the identification of defendant by Deputies Duffitt and Horn and Officer Harvey and DENIED with respect to the identification of defendant by Deputy Hardison.

IT IS SO ORDERED.

Dated this 21st of May, 2014.


_____
                Ann Aiken
        United States District Judge

18 - OPINION AND ORDER